and Exchange Commission, Mr. Dunbar for the Petitioners, Mr. Berger for the Respondents. Mr. Dunbar, please proceed whenever you're ready. Thank you, Your Honor. The Exchange Act and the Commission's implementing regulations limit the SEC's authority over securities exchanges to regulating the marketplace, including the market facilities that, quote, bring together purchasers and sellers of securities, unquote. Properly construed and consistent with how the Commission has interpreted the Exchange Act for more than eight decades, that authority permits the SEC to oversee exchange functions, namely those activities that are part and parcel of the marketplace where offers to buy and sell securities are intermediated and executed. The Commission historically has not sought to regulate as an exchange function the communications infrastructure that enables broker-dealers and others to communicate with themselves. The two services at issue here, which we refer to in the pure data transport services, that enable customers to communicate internally with themselves. The services do not perform marketplace functions and are therefore not part of an exchange over which the Commission has regulatory jurisdiction. Aren't they extraordinarily specialized in enabling transfer of data in microseconds? They are very fast transmission services, Your Honor, but the function they perform is a pure data transport function. Would that ability to transfer that amount of data so quickly have any meaning? It's only used to facilitate the purchase and sale of securities. They're not Your Honor, that is correct that the wireless connections are used in a general sense for transmitting data related to securities transactions, but the important point is that the communications are between and among customers. These are not communications networks that are connected to the exchanges themselves, and as I said, the Commission has never sought to regulate as a part of the exchange the communications infrastructure that relates to securities transactions. We believe the statute makes that unambiguously clear, Your Honor, but even where there's doubt on this point, the Commission's own regulations compel that conclusion. I'd like to begin with the statute, but then be sure to address the regulations. If I might keep you for a moment just on what the statement just made, what was or is the status of tickers? Your Honor, the statutory definition of facility references tickers, but we think the proper analog here, the market data at issue is created within the Exchange Act systems and is handed off to customers or to connectivity providers within the MAWA data center for further or subsequent transport. In other words, we think that act of publishing the data and handing off the market data within the MAWA facility is the historical analog to the ticker. As far as we are aware, and the Commission does not cite anything to the contrary in its brief, the Commission has never sought to regulate the backbone communications network. You could imagine the telegraph lines transporting ticker data to broker-dealers' offices in Manhattan or potentially even to tickers beyond those offices in Manhattan historically. Again, the proper analogy here to the ticker is the fact that the Commission has regulated the production of market data, and that is not at issue in this case, but that market data is handed off to customers for transport either on a wireless offering from one of the ICE affiliates, one of the ICE data service companies, or third-party connectivity providers. I'm sorry, you lost me on that. What is the difference? The ticker is just a device for transmitting information, and like the wireless connections here, it's very specialized and it's used only in connection with the purchase and sale of securities in contrast to, whatever, the New York Stock Exchange has phone lines from which you can call anybody. So why aren't the wireless connections exactly like a ticker? Two points, Your Honor. The first is I want to be sure to draw a distinction between the two wireless services at issue here. The first are the wireless bandwidth connections, which are simply empty pipes. I think the ticker analogy at most is relevant to the market data transmission service which is provided. And the critical point here, Your Honor, is that the exchanges and petitioners do not dispute that the market data itself, which is generated in the trading and execution systems of the exchange, is regulated as market data. That data is then made available to customers or to competing connectivity providers within the MAWA data center. So in other words, the data are produced at a production point within the MAWA data center. And at that point, the commission's regulatory jurisdiction over the ticker infrastructure ends. The data can then be transmitted by customers via fiber pipes out of MAWA, via standard telecommunications, or via wireless service offerings, including those that are offered by third-party providers. And the critical point, again, is that the commission has never sought to regulate that backbone communications infrastructure as part of the exchange. And Your Honor, I do want to make just one other quick point. Your Honor refers to these as highly specialized services. And it is true that the wireless service offerings are used by broker dealers for purposes related to their securities business. But again, the actual technology that's at issue is not, I would say, highly specialized. It is, again, a pure data transport function, the same data transport function that a piece of fiber in the ground running out of MAWA would provide. And again, I think the statutory language, the statute, we believe, makes clear that in providing these wireless offerings, the exchange affiliates are no more providing exchange functions than are unaffiliated communications providers that offer these same exchange functions. And we don't read the commission in the order it's briefed to disagree with that. The commission seemingly takes the position that these are only exchange functions when they are NYSE exchanges. And Your Honor, we don't believe there's any support in the statute for that interpretation. And the Supreme Court's decision in utility error group really forecloses this approach to statutory interpretation, which is interpreting very broadly at time one, what it means to be regulated by the act, and then attempting to flow from that. If the commission is right that providing pure data transport is an exchange function, then that would mean the fiber lines, the wireless offerings that perform those exact same functions, must be subject to Exchange Act regulation, regardless of whether they are provided by an NYSE affiliate, by the exchanges themselves, or by a third-party provider. So did you, I'm not sure if you've made this the premise of what you just said, but supposedly the other, the independent providers were using the poll on the premises of the, of MAWA, the MAWA facility, so that they are indeed doing exactly what you're doing. They would be subject to the same regulation, correct? Well, Your Honor, in that circumstance, we would submit that neither the unaffiliated providers or an affiliated provider is providing an exchange functions. In other words, in our view, the poll is simply irrelevant to the statutory question of whether these services, which again are pure data transport services, bring together purchasers and sellers of securities within the meaning of the Act. And the key point, again, historically, is that the commission has never sought to regulate the backbone communications infrastructure underlying the securities industry as if it's a part of an exchange. What if it were, what if it were 1940 and the exchange had a limited number of telephones on the trading floor and they rented those to the exchange? Is that the authority it's asserting here? Your Honor, in that circumstance, I believe the, it's very likely that the telephones themselves, which would be on the trading floor and directly connected to buying and selling activity, could be viewed as facilities of the exchange. The question here is whether the telephone lines that then carried the electronic telephone signals outside of the, of the Wall Street physical facility and across Manhattan and indeed across the country, could be regulated as if they were part of the securities exchange. Since the poll is on the grounds, why isn't the poll analogous to the phones? Two reasons, Your Honor. First, the grounds of the Mawa Center are actually simply leased by an intercontinental exchange facility. So the property is not actually owned by anyone in the ICE intercontinental exchange family. Second, the poll itself is not a, is also not owned by the exchanges themselves. And so I think the analogy breaks down on that level as well. But I think the real critical point, Your Honor, is that the poll is really, is really and can't be relevant to the statutory interpretation question here for the simple reason that the Mawa to Markham wireless connections, that is the wireless offerings that connect Mawa and a third-party data center in Canada, don't make use of the poll at all. And I think that highlights that even if the poll were taken out of the equation, the question at bottom comes back to the fact, does the provision of a wireless transmission service bring together purchasers and sellers of securities within the meaning of the act? And again, we respectfully submit that the statutory answer to that question is no, but I would like to say, I would like to say a word about the commission's regulations because again, as we explained in our brief. Let's stick with the prong three in facility. And one phrase we have is for the purpose of affecting transactions on an exchange. And you're right that these connections don't actually do the exchange, but it would seem highly artificial. And if you asked IDS, well, why are you doing these connections? The only plausible answer would be, well, in order to facilitate stock trading. Your honor, if I could say two things about the facilities definition, then prong three. The first, the first, and I don't want to resist the premise of your question, but the first point we think is an important one is that to fit within the facility definition describes a necessary, but not sufficient condition for a service or asset to be regulated as a part of an exchange. And the definition of exchange makes that crystal clear in our view. It, it establishes that only a subset of facilities are actually regulated. Those, those facilities that are market facilities that bring together purchasers and sellers of were right that the facility definition could redefine what it means to be an exchange. That would lead to an implausible result that any asset owned or operated by an exchange, or even an affiliate of an exchange could be subject to regulation under the act. But second, your honor, taking the third prong on its own terms, we believe it's inapplicable for at least two reasons. The first is that the statutory text focuses on the right to use the underlying service. And here the SEC is attempting, is not attempting to regulate any right of an exchange to use the wireless services. It's regulating the services themselves and the rates that can be charged to customers for those particular services. Second, the wireless connections don't affect or report a transaction on an exchange that are therefore not to or from an exchange. And again, the requiring a direct link to the exchanges themselves. And if you don't maintain a strict limit on what it means to be to or from, you can quickly end up in a scenario where the SEC could claim the jurisdiction to regulate every antecedent communications link that may eventually lead to a securities transaction. Whether that's communications within a broker dealer's offices, calls to a broker dealer's offices, or communications to a broker dealer's office from a customer, which is again, a reason why we think the commission has been right to insist upon a direct connection to trading activity before the third prong of the statutory definition would even come into play. I would, I know your honor suggested we talk more. Your argument has its greatest force, I think, from the parade of horribles that leads to the commission regulating the iPhone that the trader has on site at MAWA, which of course would be like they can fairly be described as their own system of communication. Now I'm in the parenthetical, but system of communications that are maintained by or with the consent of the exchange. And if we bleed back up into the main text of prong three, are all for purposes of effecting transactions on the exchange. And all of those relations are much more direct than the iPhone that the trader just has on site and can call anywhere, anyone, anywhere in the world on. Your honor, even if that language could be read as capaciously as the SEC suggests, the question is that we believe the SEC has been right to historically limit its authority over exchange functions to those things that have a direct connection to the operation of the actual securities marketplace itself. And on that system of communications language, your honor, this is where, again, we believe the commission's 1998 regulations are especially helpful. Because again, even if the statute at time one in 1934 might have been read broadly, the commission has essentially codified a regulatory definition of exchange that the services here do not meet. And in particular, your honor, be one of the commission's regulations interpreting exchange, make clear that routing orders to a national securities exchange is not an exchange function. Now, to be clear, in our view, these communications services at issue don't actually route orders and they don't actually connect directly to an exchange. But even if you were to indulge the SEC's fictions on those points, the B1 exception in the regulation makes clear that function is not an exchange activity. And in particular, your honor, I'd ask that you, I'd ask that the court turn its attention to 63 Fed Reg at 7855, which provides an example of systems that are exempt under B1. And we cite this in our reply brief at page 23. System J, the commission made clear in promulgating the regulation would be excluded from the definition of exchange. And as you can read in the regulatory history, the language says that provides no facilities for execution, but rather only acts as a communication system for the transmission of orders and execution of reports. System J falls within the exclusion in paragraph B1 of rule 3B16. So your honor, again, even if communications, the language relating to communication systems in the facility definition could be read more broadly, the SEC has because of the parade of horribles concern your honor identified, but it has also adopted a definition, a codified interpretation of the regulation that excludes order routing and order reporting functions. And again, it's of course, black letter administrative law that the commission was bound to adhere to its own regulations, and it failed to do so in that respect in this case. The other point I'd like to make just briefly. No, you don't mean that. You don't mean it failed to adhere to its regulation about System J. You just mean it's been inconsistent since this application here, correct? Inconsistent in its interpretation of the statute, not the regulation. That's correct, your honor. I, I, I, my apologies if I misspoke, but I, I did want to make clear that it's not just the System J language. It's also that exception for routing orders is actually codified in the commission's regulation at rule 3B-16-B1. As a rule of general application? Yes, your honor. That's correct. The commission suggests in its brief, I think that, well, we adopted this regulation only in the context of attempting to determine how to classify so-called alternative trading systems, but there's nothing in the text of the regulation itself that limits the regulation to that purpose. In fact, the heading of the rule is styled definitions of terms used in section 3A-1 of the Act, and the text of subparagraph A of the rule itself makes clear that the definition is essentially codifying what it means to bring together purchasers and sellers of securities within the meaning of the Exchange Act, which is, of course, the precise issue here. Give me the, uh, citations of that regulation again. Yes, your honor. This is rule 3B-16, which is 17 CFR section 240.3B-16, and the language I read, the language I read to the court about System J was in the preamble to the rule that was adopted in 1998, which was 63 Fed at 70855, which, again, we cite in our reply brief at page 23. But in addition to the B-1 exclusion, I did want to say a word about paragraph A of that regulation because, again, this was the Commission's latest effort after notice and comment to interpret what it means to bring together purchasers and sellers of securities, and the Commission made clear in its regulation that for a system to satisfy that standard, the system itself must bring together the orders for securities of multiple buyers and sellers, and the system must use established nondiscretionary methods under which such orders interact with each other, and buyers and sellers entering such orders agree to the terms of a trade. None of that occurs with respect to the functions that transport data. Judge Katsas is, of course, correct that the data that are transmitted are used to make buy and sell decisions, either on the New York Stock Exchanges or on other exchanges, but the Commission's own regulation in paragraph A says that is not enough. The system itself must instead actually permit orders to interact and establish nondiscretionary rules that govern the terms of those interactions, hearkening back to the auction market principles that are really at the heart or core of the history of the New York Stock Exchange and other exchanges themselves, and as we argue in our brief, these rules are generally applicable. They remain on the books, and the Commission was obliged to adhere to those rules or at least explain how and why those rules applied to the wireless connection services at issue here, which is, again, something that the Commission simply failed to do in the order, and as I said at the outset, even if the court had questions about how the statutory definitions might apply, if you were reading this on a blank slate, we, again, think the Commission's regulations make it crystal clear that the wireless transmission services at issue in this case are simply not exchange functions and are therefore not subject to regulation as facilities of an exchange under the Act, and unless there are additional questions, I know I'm over my time. I would like to reserve a few minutes for rebuttal. Okay. Would it matter to your argument at all if the exchange, one of the exchanges, let's say the New York Stock Exchange itself, rather than the holding company provided this service? We don't think so, Your Honor. In our view, an exchange function, and this is, you know, I say our view, we think this is what the statute and regulations demand, which is that an exchange function either is part of the regulated marketplace or it isn't, and that has nothing to do with who provides the actual service. So, if a fiber line that a broker dealer bought that runs into MAWA and that connects to the customer's equipment is being provided by an exchange function or it isn't, if Verizon sold the fiber line to the New York Stock Exchange themselves, we don't think applying a functional analysis, which is, again, what the commission purported to do in the order and attempts to defend in its brief, we don't believe that the actual owner of the service or asset should matter. What matters is, again, the function that's being important to be precise about the function that's at issue here. And again, that function is a pure transmission data function. Really, the services of a telecommunications provider, not the services of the stock exchange. But we talk about function. We talk about function. It seems to me you're losing any attention with the word facility. A facility is something that facilitates. So, if it facilitates that function, then it's a facility. I think, I don't think we disagree with that, Your Honor. I think the question is, is, again, providing internal communications connectivity that allows broker dealers to communicate with themselves, is that the function of a stock exchange? No. The question, I think, is whether it facilitates the exchange's pursuance of its functions. Well, again, Your Honor, on that point, these wireless connections are not necessary to the operation of the exchange. And if it's true that everything that could facilitate an eventual securities transaction becomes subject to regulation as an exchange under the Act, there would really be no limiting principle or stopping point to the Commission's statutory authority. That's really the issue here, isn't it? I believe so, Your Honor. The point is that no fair reading of the Act can give the Commission the authority to regulate every antecedent step that leads to the later buying and selling of securities. What Judge Katz has described as your parade of horribles, which is more or less where you are again, relates to the Commission's failure to give you a crisp rule, which makes it clear what is on either side of that line. There is no such rule or line right now. Your Honor, we certainly agree with the first part of your question, which is that the Commission didn't provide a clear explanation for why the services at issue fall on either side of any line. But I would resist the second part of the question. We do think that there is a fairly straightforward definition set forth of what it means to bring together purchasers and sellers of securities. And that, again, is the Commission's own regulations, which fairly apply to the wireless services at issue here, make clear that these are not exchange functions. If the reg is dispositive, it's a little curious that it's the last element, I believe, in your step one argument. Your Honor, to be clear, we think we have the better reading of the statute as well. But in our opening brief, we set forth in clear and independent argument that the order at issue here countermands the Commission's regulations and can't be squared with those dispositive, right? In your view, that's dispositive, that's a simple matter, right? Yes, Your Honor, we believe that is a simple... I didn't lead with it, but okay, I think I have your point. Suppose... Go ahead, Justin. No, please, you first. Suppose we agree with you on the exchange point. So we say the exchange group, the relevant group of persons are the stock exchange entities as opposed to IDS and the data providers. Isn't there still an argument that these lines are the facility, a facility of the exchange under prong three? Because even if we treat IDS as different from the exchange, they still have the right to use the premises or property of the exchange. And then we're just back to the argument about purpose of affecting a transaction. Well, Your Honor, again, we don't... That's sort of a hostile question, but it could be a friendly question to the extent that I'm not necessarily agreeing with the Commission that affiliation is, corporate affiliation is the crucial factor here. Your Honor, I think the best answer to that question is that first the MAWA facilities, the grounds are not actually owned by the exchanges themselves. But setting that point aside, if the court wants to view the entire MAWA facility as in effect owned or controlled by the exchanges, despite that, that the logic again of the court's opinion would mean that the third telecommunications lines running into the MAWA center of which these are only one types of communications path would all need to be regulated as exchange functions. And that is in a sense is a parade of horribles, Your Honor, but I hesitate to call it that. I think it's more a question of there needing to be reasonable limits to the scope of the SEC's authority over the exchanges themselves. And the point is, and this is a critical point. And what would be wrong with the limiting principle? This is not a completely bright line, but seems to me a manageable line, which is that facilities like this that are very specially designed to have one and only one which is to facilitate stock trades fall on one side and facilities that connect no differently to MAWA than to anywhere else. The normal phone line from which you could call anyone in the country fall on the other side, because that is not a system. That phone line is not a system maintained to facilitate stock trading, whereas these connections are. Your Honor, I think that line would be very difficult to apply in practice for the following reason. The fiber lines that are running into MAWA are not just for standard, you know, telephone calls from people to MAWA. They are also high speed that we're talking about the speed of light here. And that, you know, the difference is really just that light, and this defies my memory of physics, that light travels somehow faster in air than it does over fiber. But we're still talking about very high speed transport, regardless of whether we're talking about fiber lines into MAWA or wireless transmission facilities that carry data out of MAWA. And the point is, is that those fiber lines and other lines of communications are provided by all types of different unaffiliated third party providers, including one of the amicus here, McKay Brothers, is a telecommunications provider that offers competing wireless services in and out of MAWA. And under the limiting principle, I think that Your Honor was attempting to define, it would be clear that the McKay Brothers facilities themselves would also be exchange functions. It would be clear that the special access lines that perhaps a telecommunications company might provide to a broker dealer connecting a broker dealer's office to MAWA via fiber would also be a facility of an exchange under that interpretation. And so I think it becomes very difficult once you accept that the commission's jurisdiction actually extends to regulating the communications backbone underlying some of these transactions, including transmission functions. It becomes very difficult, if not impossible to draw a defensible limiting principle. And I think that failure of the commission really even to attempt to do that in the order here is significant. The logic of the commission's opinion in effect is that if an affiliate of intercontinental exchange and intercontinental exchange is a significant company with 12 regulated exchanges globally, including futures markets and clearinghouses and all manner of data connectivity services, if anything provided by an intercontinental exchange affiliate that is related to the buying and selling of securities or has some type of connection to securities transactions could be regulated by the commission as under the Exchange Act, that would truly be a we don't think it's one that could square with any reasonable understanding of Congress's intent. And it's certainly not one that again can be squared with the commission's own regulations, which authoritatively interpret in the commission's view what it means to provide an exchange function. Okay. Jeff Walker, sorry, I cut you off. No, that's okay. You basically got to what I was getting at. I'm good. Thank you, though. Anything else? Judge Ginsburg? Thank you. All right. Thank you, Mr. Dunbar. We'll give you some time on rebuttal. Thank you, Your Honors. Mr. Berger. Good morning, and may it please the Court, Jeff Berger for the Securities and Exchange Commission. The wireless connections at issue here are covered by Section 3 of the Exchange Act because they are communication systems for the purpose of affecting and reporting exchange transactions. And the commission, in reaching its order, adhered to Section 3A, which both defines exchange and then describes what constitutes a facility for purposes of that exchange. Now, as I understand Petitioner's argument, which has changed over the course of this litigation, they're no longer focusing on corporate separateness, and they now agree that exchange turns on functionality. So let's go to what functionality means in the commission's view. Is the commission focusing on corporate separateness? I thought you made a fairly big deal out of the affiliate relationship between IBS and the stock exchange. We were responding to the argument made in the opening brief that affiliation was relevant or, in their view, lack thereof. So that was in response. And I will say, and I'll get to this in a little bit if that's okay, I do think affiliation is relevant to answering about the parade of horribles you talked about with Mr. Dunbar. But I don't think, for purposes of straight functionality, we can accept that we can just start with functionality. And as to functionality, the commission's reading is that the wireless communication systems are exchange facilities, which is a better reading of Section 3. To be clear, the commission has consistently found that exchange functionality includes communication of orders and market data to facilitate transactions at MAWA. And I want to respond specifically to something Mr. Dunbar said. He said that the commission has not historically regulated telecom infrastructure. But I would add, as to MAWA, which is what these particular filings were all about, the commission has consistently, since MAWA opened in 2010, reviewed rules proposed by the exchanges regarding backbone infrastructure, such as fiber connections, local area networks, smaller band wireless connections. But most importantly, the commission has regulated wireless connections at MAWA provided by these exchanges since the end of 2015. So the whole historical argument doesn't really work here. What petitioners are advocating for here is an artificial restriction. In their view, exchange functions are only those that connect directly to the matching engines. They're only the ones that bring buyers and sellers together in the most literal sense. But our understanding is most faithful to the statute because it takes into account Section 3A1 and Section 3A2. And to emphasize the language, it includes any service for the purpose of effecting and reporting a transaction on an exchange. And in the parentheses, any system of communication to or from the exchange. That is exactly what these wireless systems are. They are systems of communication. And I recognize that Mr. Dunbar is using the phrase pure data transport. But at this point, the exchanges agree that these services are a means to facilitate trading. Every single commenter, except the exchanges, describe these services as used solely to facilitate trading. And as part of explaining why these particular services satisfy Exchange Act Section 6, which we'll talk about a little more later, they describe them as their virtue was they enhanced trading efficiency. So they're beyond just pure data transport. The only reason anyone is going to spend, market participants, I should say, are going to spend $500,000 a year or up to $500,000 a year, is to facilitate rapid, super rapid, transport of orders to complete transactions and to receive data. That is why people buy these things instead of, for instance, just buying DSL from Verizon. These are specialized services that serve market participants who both have facilities, or I shouldn't say facilities, excuse me, equipment at MAWA, as well as the other two data centers in the New Jersey Triangle, as well as the Markham Data Center, which serves some of the Canadian exchanges. Again, the only reason people use these is as a system of communication for the purpose of affecting and reporting transactions. That is the whole goal. So if this is all about a question of exchange function, these wireless systems are precisely the type of communication systems that market participants use to transact, particularly on a modern stock exchange. The only way petitioners get to their conclusion is by, in effect, rewriting the statute to add this direct connection requirement that the Commission has never imposed, nor could it because Congress didn't put it in there. To be clear, Section 3 does not limit the Commission's authority solely to trading and execution systems. It's much broader than that. And facility uses extremely broad language. And I think an important case to look at here, I grant you it's a little old technologically, but the Seventh Circuit's decision in Board of Trade, there are actually two Board of Trade decisions. I'm principally thinking of the second one, which I believe was 1991, we cited in our brief. That's a situation where in deciding a registration issue, granted it dealt with clearing agencies, the Seventh Circuit noted how broad the language was in Section 3. And it viewed it as giving the Commission maximum control over exchange regulation, and probably most importantly, was intended for the Commission to have flexibility as exchanges evolve. So if you're finding the language to be very broad, affecting reporting transaction on exchange, any system of communication, I think that was intentional by Congress. I think Congress wanted to make sure that as exchanges evolve, and exchanges were evolving in 1934, they were certainly very much evolving in 1975, and they're evolving as we speak, to give the Commission some authority, excuse me, some flexibility to deal with different situations as presented. I believe Judge Cassis, and I apologize if I'm attributing a different question to you, but you mentioned tickers. Right. Tickers are an appropriate analogy here, although I would caution that they really are an analogy, and only for the market data connections really. But that is a situation where market tech, excuse me, tickers never connected directly to the exchange floor, as we point out in our brief. But more importantly, no one can really describe a ticker as literally bringing together buyers and sellers. But it was clear to Congress from how they described the statute, they put the word ticker in there as, in essence, an example of a system of communication that meant to encompass that within an exchange facility, and to give the Commission authority. In fact, tickers were one of the few areas in the original version of Section 19b, which is different from the one now, that the Commission had authority over in terms of supervising SROs. I wanted to talk about a couple of points, and I really just think we should get to the creative horribles, because it's obviously a new judge's mind. I think it's an important point, because- Berger, I agree, but I just want to clear up something you just said. Yes, Your Honor. About the Seventh Circuit case. Yes. That was resolved as a Chevron's Part II matter. And it seems to me that the gravamen of your argument is overwhelmingly based on the clarity of the statute. I think that is true, Your Honor. And I do view Chevron's Step 2 as an alternative argument, sort of an at a minimum argument. You didn't fail to invoke it after strenuously arguing for a clear statute. We did discuss it in our brief, or you're saying- I mean, but most of your argument, and I thought everything you've said so far, was arguing that that's what the statute clearly requires. You're absolutely right, Your Honor. I bring up the Seventh Circuit's decision, not really in terms of the main thrust of our Step 1 argument, which you'll correct, is our main argument. Although, again, we do see an alternative argument, but just to point out that there's another court that has looked at Section 3 and has found the language to be intentionally broad. I mentioned it only for that reason, at least at this point. All right. So as to Parade of Horribles, in sort of- I would touch on a few different things. One is a matter of history. Again, the Commission has been regulating facilities at MAWA in various telecommunications systems at MAWA for 10 years now. There is no incidence of the Commission having reached beyond MAWA to regulate AT&T or telecom providers serving random brokers who happen to send orders to the Exchange. And there's a reason for that. And the reason is the centrality of MAWA and the Exchange's control of MAWA. And this is where, at least in our view, why affiliation in corporate relationships does become important. What Congress was most concerned about in 1975 in setting up the current version of our statutory scheme, particularly with regard to Section 6, but also the review process in Section 19, was Exchange control of facilities. You read 6b-4, 6b-5, 6b-8. And what Congress was- and I would add also the Senate report number 94-75, which accompanied 75. And I know there's differing views on legislative history, but this happens to be a report this Court has cited often and is very illuminating with regard to what Congress did in 75. And what Congress was clearly concerned with was the ability of Exchanges, based on their control of premises, of facilities, to exclude others and affect particularly communication systems and data transmission. It's why Congress gave the Commission more authority to regulate precisely this area. And it's why Congress created the Section 19 process, which is a public, in essence, notice and review comment for these types of rule filings. And the Commission does consider affiliation important as to why it hasn't gone further. And again, there's a track record of it not having gone further during the entire time of MAWA's existence. And the reason is that the Exchanges, which apparently in this instance have sort of offloaded certain facilities to these subsidiaries, the IDS subsidiaries, which I'll just lump together, because petitioners do as well, that they can still gain control over the ability of people to access those facilities and get that crucial latency edge, that crucial latency advantage, which as the commenters in this case and the Commission's expertise recognizes, can make all the difference. I recognize... They could exclude anyone from their facilities. But they can't exclude people from the marketplace itself. They don't control the marketplace. They don't control, in this case, what we call the matching engines, which is basically the modern term for the trading floor. It's the place where buy and sell orders are matched to execute a transaction. And to us, that's the entire point here and the entire relevance of why the Commission has consistently regulated exchange facilities, communication facilities, as well as co-location facilities, which shouldn't be ignored here at MAWA, but hasn't gone beyond that. Mr. Dunbar mentioned that ICE has all these other entities, other exchanges in the world, other data services. There's no incidence of the Commission regulating any of those. They're not new. They've been around for quite some time. The Commission hasn't regulated them because they don't have that as everyone agrees in this instance, the nerve center of what is now the New York Stock Exchanges, and I use plural to encompass all five. So, Your Honor, Judge Katsas, you asked a hypothetical and about, it's not really facilities in general, it's facilities like this. And I think I agree with that point very much, because I think MAWA is the key here. The issue that was presented to Commission, and I do want to emphasize, this is not a rule meeting. The Commission did not, is not making a legislative or substantive rule. We're not invoking Section 3 to, for instance, redefine facility. We were presented with a proposed rule change by the exchanges that presents the Commission with a very definite set of facts regarding a specific system of communication at a specific location. And I mention this because once that comes into us, we make a determination of whether it is consistent with the Exchange Act or inconsistent. In this instance, we approved it because we deemed it consistent. If there are different facts and circumstances presented in a different context, including a different type of facility, there may be a different analysis. And the Commission has made clear over time, particularly with regard to the order routing type of scenario, which is the example Mr. Dunbar gave you, the 63 Fed Reg, that's in the broker-dealer order routing, and I'll talk about that in one second. But that scenario, different facts and circumstances under a Section 19 analysis, under that process, it is possible it will produce different results. But I will say up to now, with MAWA, we have not gone beyond the MAWA boundaries in terms of what we've regulated for systems of communication. So let me give you one different one that interests me, which is the identical arrangements you have at MAWA, except IDS, instead of being an affiliated company, is a separate company and they're doing this, they're offering this as a joint venture, or just companies supplying complementary services together. How would you analyze that? I would say you really have to look at the facts and circumstances of the joint venture, and I know your Honor probably... It's the same arrangement. It's the same arrangement as IDS? Yeah. Make IDS an unaffiliated company. If the exchanges still have the ability to leverage their control over the matching engines, the marketplace, access to those matching engines, it's the same analysis. It has to be the same analysis, precisely because of what the exchanges can do in terms of excluding. And I'm inclined to agree with you, except you seem to have put such heavy emphasis in your brief and in the underlying order on the fact of affiliation. And I will say, Your Honor, one that was in response to the arguments that the petitions were making, that affiliation is irrelevant. Meaning that just because their initial argument was because the IDS affiliates sort of control the system, therefore it's not an exchange. That was partially our response. But let me add a little bit beyond that though, which is that particularly in these, what we're calling routing orders. Again, these are a series of orders. We cite them in our brief. Mr. Dunbar mentioned one of them, but the commission has consistently said in these situations where broker dealers are in effect routing either buy or sell orders to exchanges. We have said that the relationship between the routing broker and the exchange is a fact that gets considered in determining whether it's a facility of the exchange. I mean, there's a track record of this, and we've said in some instances where there's no relationship, contractual or otherwise, it's not a facility. And in others it is. And again, the whole principle behind that is the element of control over the marketplace. So, sorry, walk me through within the statutory definitions of exchange or facility where affiliation comes in. To us, the concept of affiliation comes in with the group of persons constituting, maintaining or providing the marketplace or facilities. And then even though group of persons to me just sounds like people acting in concert, not corporate affiliates. Yes, but I think that sort of gets to your point that while we're talking about corporate affiliation in this particular, I don't want to say rulemaking, but it's not a rulemaking in terms of this SRO rulemaking. Those are the facts that were presented here. In a different situation, is affiliation not necessarily, for instance, a corporate subsidiary relationship, but rather a contractual or joint venture relationship? Yeah, that could be a relevant factor the commission considers in facts and circumstances in determining whether a specific proposed rule change fits within. Your Honor, I know I'm a little over, could I have just a few minutes to talk about rule 3B16? Sure. We gave Mr. Dunbar a fair amount of extra time. So, take a few minutes if you'd like. Sure. I want to call attention to a few parts about rule 3B16. So, first of all is just start with the text. What that rule is establishing is a definition of exchange. What it is not doing is discussing facility at all. It is not putting limits or creating any other gloss on the statute of what facility means. So, it doesn't touch it, talk about what any service for the purpose of affecting the reporting of transaction means, any system of communication. That is not what it is doing. Within just the exchange definition, though, all you have to do is juxtapose sub A with sub B to understand the context of this particular rule. So, it is establishing in A what is an exchange, and then in B is operations will not bring certain actions within the definition of exchange. And the reason it's doing that goes to precisely why 3B16 really isn't as relevant here as Mr. Dunbar suggests. 3B16 was adopted as part of reg ATS. And Mr. Dunbar has referred the court to sort of the system J example. So, we can then get into the context of reg ATS. There are different regulatory buckets for the commission. There's exchange regulation, and there's broker-dealer regulation. At the time 3B16 was adopted, it was back in 1998. This is pre-MAWA. This is pre-full-time automated trading, the way the world looks now. But there was a rise of what are called alternative trading systems that were principally run by broker-dealers. There was a regulatory dilemma that arose, which is do you regulate these entities as broker-dealers in that regulatory bucket under Section 15 and other statutes, or do you regulate them as exchanges under Section 6? And what reg ATS did was basically create a train switch, basically telling these alternative systems you can either A, register as exchanges, or B, continue to be regulated as broker-dealers, but you have to comply with specific requirements under reg ATS, which is a different part of the commission's regulatory code. So, it's not enough to just look at 3B16A in a definition of isolation, which again is really deciding or determining whether a broker-dealer has to register as an exchange, whether the function they're providing in an alternative trading system puts it in that exchange bucket or allows it to stay in this reg ATS bucket, meaning this alternative form of regulation bucket. What it didn't do, very clearly, is it did not attempt to define facility, system of communication, or service for the purpose of effecting or reporting a transaction. And what it absolutely did not do was impose this direct connection requirement that petitioners want to read into the regulation. Reg ATS was brought to the court's attention to try to show that the commission was somehow inconsistent with its past conduct, and it simply is not inconsistent. It's a different purpose. The commission has been consistent throughout the years. It has consistently stated that the broad language in Section 3 means the facility determination requires a facts and circumstances analysis. And the commission, again, has consistently reviewed rules regarding wireless communication, along with other MAWA co-location services, for consistent with Section 6. And to just talk for one second about co-location, in there below, the exchanges have conceded that co-location is a facility, co-location at MAWA. Co-location is a service the exchanges offer that allow broker-dealers to place their equipment close to the matching engines because, again, it gains them a speed edge, or seen from the other side of the coin, reduces latency. Co-location does not connect directly to the exchange, but the commission has always regulated it as a facility at MAWA. And as I understand the petitioners having said, and this is JA-161, MN-43, is that they all concede that co-location is a facility. Sorry, I thought the co-located servers were directly connected to the matching engines. They connect through a common pathway, which means they all have, so they are like one step removed from the point at which the co-location enters the matching engine. And the reason why that is, is so that no co-locator has an edge, meaning that for exactly the idea that- They all have the same cable length. It would, yeah, it would be like you all have to go in through the same door so no one can cut ahead of line, because if you allow people to cut ahead of line, this goes back to exchange control at MAWA, they can give preferential turns. And the Section 19 process worked exactly as planned here. In response to commenters' concerns about those latency advantages from the poll, the exchanges amended their proposal to eliminate the latency advantage that would be consistent with Section 6. Without that review process, without that public review process, the exchanges could have leveraged their control of the marketplace to charge more for these services and or discriminate against market participants. There's a question about the statute, which is, and this goes a reg, defines only exchange and not facility. But one thing that's puzzling me is trying to understand how the two definitions interact with each other. There's a huge circularity problem, which is that the exchange definition uses the word facility and vice versa. So how do we, how should we unpack that? Do we start with the exchange definition with kind of an intuitive platonic idea of facility in the back of our minds or vice versa? Or can we come at it either way? It's an interesting question, Your Honor, and I'm not really disagreeing about the circularity, although I think in that instance it plays to our benefit because it makes the language broader. But I do think you actually start with the exchange definition because it sort of defines the universe of who in terms of the types of entities that the Commission regulates. And to me then the key of sort of why I say that, although I don't think the other thing you're proposing is necessarily sort of wild or unreasonable, but the reason I say that is because then it goes down in that last phrase, includes the marketplace and market facilities. And then that leads you into 3A2 when, again, the term facility includes, not means, but includes. So it suggests enlargement that what's coming next are examples, sort of not the clear and only definition. And that gives you these types of examples of services, facilities, things that make functioning easier to use a sort of dictionary definition of facility that exchanges can offer. I think the goal of all that in my view, in my understanding of the history of the statute, the Congress was to make this as broad as possible to make sure the Commission had authority over exchange regulation. I guess, I mean, you're right. It's probably a little bit more logical to start with exchange, but assume just hypothetically that I think your case on facility is stronger than your case on exchange. And when we drill down into factor three, I think your case on the parenthetical is stronger than your case on the prior language, which leads me to wonder, would I be messing anything up if I just said, look, the easiest, clearest ground on which you win is just that parenthetical in factor three of facility, and I don't need to worry about anything else. I think you can go that route, particularly because it makes 3A1, you would still have to go back in 3A1 at some point, you have to talk about the whole statute, but 3A1 points you to market facilities. So you could start with the parenthetical, sort of say, is this a facility? Yes. If it's a facility, is it part of a market facility, particularly since this service, this exact communication system here serves MAWA, your answer is yes. And you can, you know, affirm or uphold the Commission's order on that basis. Okay. Judge Ginsburg, anything else? No, that's it. Thank you. Judge Walker? Let me ask one hypothetical, if I can. I'm looking at the figure three Google Earth photo on page 17 of the amicus. Your Honor, can I just ask which amicus so I can look at it with you? I apologize. Yeah. Sorry about that. It's the McKay brothers. Okay. I have it open. Sorry. And so just as a preface, this goes to what your limiting principle and what I've had in my head as I prepare for this argument was that maybe part of the limiting principle is that the MAWA poll is on the facilities, the public access polls are not. And so imagine in this photo that the MAWA poll were on the other side of the street there, the little street, right next to the other two public access polls. And so it's not on the grounds of the MAWA data center, still owned by the same people who own it now, but it's not on, it's not on the grounds. Is that a facility of an exchange? I would say, yes, it is, your Honor. I would say the fact that... Why is that? Because that... I'm sorry, your Honor, I cut you off. No, I cut you off. Please go ahead. It goes back to, this is where we get into affiliation. This gets into the exchange's control of the MAWA facility. The fact that the poll is on the MAWA premises in reality is a factor we consider, but if the poll were off next to the public access polls in this picture, the exchange entities that control the marketplace still have the ability to prefer access to those who place their equipment on that poll. Now the latency advantage, right, would go away, but under what the exchange has offered here, and the reason the commission approved it, the latency advantage also went away. But the fact that the poll is in the public right away, but they still control access to it, that is the key in terms of why that would still be covered. And I would note that that is basically the Markham example. These private polls really just serve the New Jersey connections. The Markham, as far as we understand from the record, the Markham connections are on a poll that does not use the MAWA poll. But what I'm trying to say here is that the MAWA poll is important to our analysis, but it's not the only part of our analysis. The analysis doesn't hinge on it. If everything you just said is right, then I am beginning, then I'm back to worrying about Pareto Horribles that you and my colleagues had more or less with their questions and your answers talked me out of. If what you just said is right, then it seems like you could regulate Intercontinental if it bought Verizon, and you could just regulate all of the cell phone connections that Verizon does that have anything to do with the New York Stock Exchange buying and trading, buying and selling. Well, I mean, it's hard to sort of believe that just cell phone connections are going to have that same core purpose of affecting and reporting transactions that these particular wireless services have. But let's just say, for instance, I'm trying to think of an example that gets us back to NYSE rule 36, which does in fact sort of place limitations on the ability, this is sort of back in the floor days at 11 Wall Street, the ability of brokers to be able to communicate using certain types of, it's not about the cell service itself, it's about the timing and way in which you use cell service. There are rules about that the commission has reviewed. Now, we're not regulating AT&T or Verizon itself, but you are regulating the pathway or the way in which the communication system is run in part, because again, there's a control of the marketplace. So I don't think it goes back, I don't think it leads to that parade of horribles at all, precisely because we're talking about this poll at MAWA here, where the exchanges can still leverage their control of the marketplace, of the matching engines that are just inside the building, as well as the fiber paths that lead from the poll to the building, all of which are on the premises. That is what distinguishes this from, for instance, a poll 80 miles away, that AT&T owns. Your limiting principle has a lot to do with the leverage that Intercontinental has, and you're imagining in my hypothetical, well, they might be able to still have some additional leverage over competitors. That's your limiting principle. I mean, that's the analysis that we do under section 19. That's the analysis Congress charged us to do under principles like 6B4, 6B5, 6B8, is to consider whether there's any inappropriate or unnecessary competition. So yeah, I mean, we are going to have to take each communication system as it comes in, which is why we've emphasized the facts and circumstances analysis. I recognize that that is not the most edifying thing ever to hear in terms of bright lines, but also, I don't think that's what Congress had in place with this. We're not creating a rule that covers all facilities going forward. We're dealing with a particular set of facts as given to us. Please go ahead, Judge. Just in the section 19 process. Sorry. Counselor, just briefly, what is the exact mechanism by which this control would be exercised? Is it slowing down the other's connections at the matching engines or just what is it? I think it would be more charging more. Okay. To me, I mean, this is a hypothetical because it didn't happen here, but if you're one microsecond closer, everyone needs to be one microsecond closer to compete. You would need to go to the exchanges for that and exchanges could charge more supply and demand. So that's an essence. And although I suppose there's a concern about blocking access as well in another context. Excluding is a bit of an overstatement. It's discriminating. You're right. You're right. And frankly, that's the term that I believe is used in the statute. So I should have said that. Also equitable allocation of reasonable fees is the language in 64. That would also, what we're talking about, price differentials would fit into that. Yeah. And in this case, it is the location of the poll that is the reason that some people get to buy at a lower price and other people have to buy at a higher price. Is that right? I mean, I think it's more that there's one price, but the latency was equalized. But I thought that the people who use the Mahwah poll are able to buy a microsecond faster than other people. And so they're able to buy it at a lower price. So what happened as a result of the section 19 process was the exchanges basically committed to what's called... Oh, no, I understand. I understand. But that's because they, but if you had no jurisdiction here... Yes, that would be the concern. That would be the concern. That would be the concern is that the prices would be higher. And if there is a legitimate concern on that ground, then I think your case for having the authority you assert and for this being a facility of an exchange is a lot stronger than if that leverage did not exist. Right. And I mean, what we heard from every commenter was a deep concern about that exact issue. And the commission was persuaded by those comments. So just to be clear again, the disparity in pricing you're talking about is not with reference to the transactions on the exchange, it's with reference to the price paid for access through the tube. Yeah, in essence, speed. Well, that's why the price is higher. Yes. Right. Yeah. To get that speed. And the brokers would pay the higher price for that access so that they could buy at a tiny bit lower price, a microsecond faster than other people before the price rises. So the broker dealers, the market participants who would buy this service, most of them have their own equipment at all three of the major data centers in New Jersey. In order to fulfill their duties in the national market system, they are constantly having to triangulate to find the best price among the exchanges. And most of the stocks we're talking about here, trade and all three exchanges, all three exchange families, I should say. So there's constant data and order going through all of these, through this triangle, which is absolutely necessary and by congressional design. But late data is pretty much useless data. So this stuff is mission critical for the market participants who would pay all this money for. Anything else? No, thank you. Mr. Ginsberg? Well, just one last thing then, Mr. Berger. If everybody has access to the same speed of connection, and that's not a feature of their competition, what do they compete on? What do they compete on in terms of this particular service or? No, no. If they can all get to the exchange at the same time and see the best price. Oh, you mean the market participants, excuse me? Yeah. I mean, information is one, how they assimilate the information. There's a variety of things, but also some of it is just complying with their best execution requirements that are imposed by law. Right, they're all able to do that if they have the same access. If they have the, and if they can do it as quickly as physics allow. All right. That's a good one for me. Thank you. All right. Thank you, Mr. Berger. Mr. Dunbar, we'll give you a few minutes. Thank you, Your Honor. I think Mr. Berger's answer on the poll question gives away the SEC's position here, which is that ultimately the interpretation set forth in the order is based on affiliation standard, not a functional analysis of whether the service issue is actually providing an exchange function. And I think that's critical because there is no, and I didn't hear Mr. Berger supply one, no textual basis for an affiliation gloss on the group of persons, language, and exchange. Judge Katsas, you asked the hypothetical question, what if we had this exact same it's the McKay brothers and it's the other wireless and telecommunications providers that run facilities into the MAWA facility. And so I hate to complicate Your Honor's lives, but I don't think parenthetical three, Judge Katsas, for that reason is a straightforward answer to this. That language refers to any system of communication to or from the exchange maintained by or with the consent of the exchange. And if the court is treating the entire MAWA data facility as essentially part of the exchange family, which again, we think would be counterfactual, but accepting that for the sake of argument, that would mean any communications line, fiber, wireless, what have you, into MAWA is there with at least the consent of the exchange and therefore would also be a system of communication subject to regulation under the act. Now, Mr. Berger spends a lot of time attempting to say, well, we've never attempted to regulate in that manner. That type of argument that, you know, don't worry court, we will forbear from exercising our authority is one this court has repeatedly rejected when it comes to statutory interpretation, including in the Merck decision we cite in our brief, which says that you measure an agency's assertion of authority, not simply by the application at issue, but also by the implications claimed from that authority. And the bottom line, and I think this goes back to a question, Judge Ginsburg, you answered in the opening. The bottom line is that there is a fundamental inconsistency at the heart of the order, which is to claim that it is regulating based on whether the function at issue is an exchange function, but to essentially be regulating on the basis of corporate affiliation. And again, a assertion of corporate affiliation that has no foundation in the text. As Judge Katsas noted, if a group of persons is even unaffiliated persons is cooperating to provide a marketplace activity, a forum where buyers and sellers of securities can meet and engage in transactions that has nothing to do with whether the entities are affiliated or not. It has to do with the functions being provided. And again, that basic inconsistency, the commission's nominal embrace of a functional standard, but its refusal to provide it in an attempt to apply some type of affiliation standard is a type of inconsistent internal inconsistency in an agency's reasoning that itself is a ground for vacature of the order. Let's assume we agree with you. It's either all in, everyone's regulable or no one is regulable. Why shouldn't we conclude starting with the parenthetical in prong three that McKay could be regulated? They provide a system of communication, which goes to the exchange, maintain buyer with the consent of the exchange, and to cut off the absurd hypotheticals, we gloss system of communication to mean something that's specifically or exclusively or primarily to facilitate stock trades. What's wrong with that? Two responses, your honor. The first is there's a basic Chenry problem with all of this, of course, you know, none of this explanation or setting aside the Chenry issue. I think the fundamental problem is, is that if you don't read to or from the exchange to actually mean to or from the exchange, and you read it to mean anything, and maybe anything is too broad, but other things that could facilitate securities transactions, you quickly run into line drawing problems that are extremely difficult. Mr. Berger referenced the idea that these means of communications are used to facilitate security transactions, but think of all of the things that are also used by broker dealers might consult. If ICE acquired a company that provided stock-related news to broker dealers, I think the logic of the commission's position would demand that that news service be regulated as an exchange function. Computers or communications within a broker dealer's office, there is no good limiting principle unless you read to or from the exchange, again, consistent with the commission's eight decades of interpretation, at least prior to the 2013 orders that Mr. Berger referenced, consistent with the commission's consistent communication that we are not going to regulate the communications backbone. That's left to perhaps telecom providers, the FCC, but that's no business of the SEC. And I think that's the fundamental problem, Your Honor, with parenthetical three, which is that it becomes very quickly to articulate, it becomes very difficult, I should say, to articulate a defensible limiting principle once you move away from communication systems that directly connect to the exchange. And I think the parenthetical three example also leads to another point that I really do want to stress on the regulations. Oh, I'm sorry. So exchange by exchange, you mean just the matching engines? Your Honor, we think the exchange is more than just the matching engines. It's the servers that are in MAWA that have to do with the intake of data, including buy and sell orders. They're which is the creation of the market data itself. We think all of those things are fairly described as core marketplace activities. So I don't think we're suggesting it's limited to just the specific server, but it is limited to a specific functionality. And the point again is that these are internal communications by a broker dealer itself. And if those are treated as regulated exchange functions, I submit to you, there is not a defensible way to say that turns on the affiliated status of the provider offering that communication service. Either that communication service is or is not an exchange function. And again, the statute runs into innumerable line drawing problems that the SEC really hasn't even attempted to deal with in the order and articulating its interpretation. But more to the point, and again, even if in a read the facilities definition in light of the exchange definition in the statute, we do submit that the regulations answer this question in a very straightforward manner. Mr. Berger suggested that the regulations were not intended to define what it means to be a facility, but that's plainly contradicted by the text of the regulation itself, which says that the purpose of the regulation in paragraph A is to define what it means to provide a marketplace or facility for the purpose of bringing together purchasers and sellers of security. And if you just take a quick look at even the- That's just the statutory language in 3A1, right? That's correct, your honor. But I think that's our point, which is that it's not enough- That's his point, that this reg is about exchange and not facility. Putting aside the circularity issue, to the extent there's any difference, it's a 3A1 definition. Your honor, and I think this is a critical point. We respectfully believe that what the definition of exchange talks about are market facilities that serve a particular purpose of bringing together purchasers and sellers. And our point is that the commission's regulations define what it means to that type of facility. So we think it's wrong to suggest that the regulation provides no insight into what a facility is for purpose of regulation under the act. And if you read the preamble to the rule, the 1998 rule, it's clear, the commission was clear over and over again, that rule 3B16 was meant to define essentially a functional activities-based inquiry for what it means to and the point is that the services at issue here, the wireless services that are issued here, which again are internal communications functions that transport data to or from customers, that those are not exchange functions within the meaning of the commission's own regulations. And system J makes that, the system J example we pointed to makes that very clear. And I think the argument Mr. Berger is making that, well, this was adopted to help us deal with the problem of alternative trading systems is correct, but there are often specific problems that prompt agencies to promulgate or revise their rules and the text of the regulatory change that the agency accomplished goes beyond the specific problem before it. And this is a circumstance where the commission adopted a generally applicable, to borrow Judge Ginsburg's generally applicable regulatory standard for interpreting exchange, including Judge Katz's, what it means to be a market facility, which is I think the critical issue here. And we'd respectfully submit that the commission has really made no reasoned effort to square what it did here with its own regulations, which again is an independent reason that the order can be vacated. Okay. I understand. Judge Ginsburg, anything else? Yes, please. Mr. Steinbaugh, you opened with saying that council for the SEC had sort of given away the game by saying it really, or revealing it really does depend upon affiliation, corporate affiliation, because any alternative provider would be there with the consent of the exchange, which is an alternative to being maintained by the exchange, correct? But his point seemed to me turned not on that, but on the ability to exclude or price discriminate. And if the provider is there with the consent of the exchange, it would be on the terms dictated or reached by agreement with the exchange, in which case the exchange could still keep its exclusivity in zero or lesser latency by, or by charging more for others to get it. Same discrimination, just with the consent. Your Honor, I think I agree with that, but I took that explanation to mean what's driving the commission here is the commission's view to borrow. I think what Judge Walker said, the leverage that is inherent, apparently as the commission sees it, in the idea that part of this ICE exchange family are actual exchanges themselves. In other words, Mr. Berger suggested that it doesn't really matter where the poll is located on or off premises. The SEC is going to take the position that if anyone in the ICE family gets into the business of providing communications, there is somehow a potential for discrimination that requires regulating their services as if they are provided by the exchanges themselves. And that I'd submit, Your Honor, is essentially another way of saying that affiliation is what's driving the outcome, not the location of the poll. But to the point about exclusion, I do want to say, Your Honor, that I think to conclude that the Exchange Act does not remedy any particular problem with access to a poll or not, is not to say that there is no regulatory apparatus or laws that would be in place, including general antitrust standards that would continue to govern access to the polls and fair competition. The question isn't an abstract policy one of how best to regulate fair competition in this space. The question is, are these communication services exchange functions? And again, the policy preferential access point that the commission is making, I think only show that what's really driving their conclusion here is affiliation and affiliation that has no textual anchor in the statute. I'd also be remiss though, Your Honor, if I didn't point out that the idea that the exchanges themselves would have the incentives to attempt to artificially constrain competition or raise the price by which broker dealers could interact with the exchanges contradicts all economic logic. These exchanges compete vigorously with alternative trading systems and other exchanges across the country for order flow and for transactions on the exchange. So the fiction that this ICE corporate family would want to engage in preferential discriminatory activity that raises unnecessarily the price of actually conducting business on the exchange is one that doesn't have much of a basis in economic logic we would submit either. But at the end of the day, we simply don't think those policy concerns justify reading or rereading, in our view, either the text of the Exchange Act or the commission's regulations, which established that these wireless transmission functions are not exchange functions under the Act. And if there's no further questions, we thank the court for its time. All right. Thank you, Mr. Dunbar. The case is submitted.
judges: Katsas, Walker, Ginsburg